IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHARMAINE EASIE-SAMUELS, | ) | Civil Division |
| | ) | |
| Plaintiff, | ) | No. 23-1587 |
| v. | ) | |
| | ) | |
| ALLEGHENY COUNTY AIRPORT AUTHORITY | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

AND NOW COMES Plaintiff, Charmaine Easie-Samuels, ("Plaintiff" or "Ms. Easie-Samuels"), by and through her undersigned counsel, and brings this Complaint seeking legal and equitable relief for the race and national origin discrimination and retaliation she faced while employed by the Allegheny County Airport Authority (the "Airport") in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1981 ("§ 1981") and the provisions of the laws of this Commonwealth, to wit, the Pennsylvania Human Relations Act, 42 P.S. § 951, et seq. (hereinafter referred to as "PHRA"). Ms. Easie-Samuels states and avers the following:

## JURISDICTION AND VENUE

1. Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331, 1343, 1343)(a)(4) and 1391. This action is authorized and instituted pursuant to Title VII and § 1981.

2. Pursuant to 28 U.S.C. § 1367(a), The United States District Court for the Western District of Pennsylvania has supplemental jurisdiction over Ms. Easie-Samuels' state-law claims, which arise from the case and/or controversy as the aforementioned claims, for which this Court has original jurisdiction.

1

3. The unlawful employment practices and wrongful termination were committed by the Defendant in or around Allegheny County, Pennsylvania. Therefore, the United States District Court for the Western District of Pennsylvania is the proper venue for the action under 42 U.S.C. § 2000e-5(f) and 28 U.S.C. §1391(b).

## ADMINISTRATIVE REMEDIES

4. Plaintiff has satisfied all procedural and administrative requirements set forth in Title VII because:

   a. Plaintiff filed a timely written Charge of Discrimination (jointly) with the Equal Employment Opportunity Commission ("EEOC") and Pennsylvania Human Relations Commission ("PHRC") asserting her state and federal claims on October 24, 2022.

   b. Plaintiff received her Determination and Notice of Rights from the EEOC on June 8, 2023.

   c. This action was filed within 90 days of receipt of the aforementioned EEOC notice.

## PARTIES

5. Charmaine Easie-Samuels is an adult individual who presently resides in Triangle, Virginia.

6. At all times relevant hereto, Ms. Easie-Samuels was an employee of Defendant within the meaning of Title VII.

7. Defendant, Allegheny County Airport Authority, is a municipal authority, governed by a Board appointed by the Allegheny County Chief Executive, charged with operating and managing Pittsburgh International Airport and Allegheny County Airport.

8. Defendant's principal place of business is Pittsburgh International Airport, Landside Termina, 4th Floor Mezzanine, Pittsburgh, Pennsylvania 15231.

**FACTS COMMON TO ALL COUNTS**

9. Ms. Easie-Samuels was hired by the Airport to work in the position of Vice President, Human Capital & Airport Operations Communications in the Airport's Marketing, Communications & Customer Experience Department.

10. At the time of her hire, the Airport's diversity statistics were abysmal with respect to its leadership positions.

11. At the time of Ms. Easie-Samuels' hire, there were zero (0) People of Color with the title of Senior Vice President; there was only one (1) Black Vice President (excluding Ms. Easie-Samuels), and there was only one (1) Black Director, out of approximately thirty (30).

12. Ms. Easie-Samuels' experience at the Airport demonstrates the organization's undercurrent of bias and discrimination towards People of Color.

13. At the outset of her employment Ms. Easie-Samuels quickly excelled at her position, from an objective standpoint, without receiving so much as a verbal reprimand.

14. She was regularly praised for her work and her contributions to the Airport's execution of strategic communications that focus on leadership, employee/internal and HR priorities.

15. Ms. Easie-Samuels brought over fifteen (15) years' experience in global communications to the Airport.

16. Despite the chain of command detailed in her offer letter, Ms. Easie-Samuels was reporting directly to Christina Cassotis, Chief Executive Officer ("CEO Cassotis") along with the three Vice Presidents in Marketing Communications.

17. No one with whom Ms. Easie-Samuels interviewed was in her chain of command.

18. In March of 2022, Ms. Easie-Samuels was advised by CEO Cassotis that her role was going to change, but that she would keep her title, transitioning to Vice President of Internal Communications.

19. She was told she would no longer support HR and Public Safety, Operations and Maintenance ("PSOM"), and that these responsibilities would be assigned to a replacement.

20. Lisa Naylor, Chief Human Resources Officer, attended the meeting where this news was delivered, which was perceived by Ms. Easie-Samuels to be an unwarranted, inexplicable demotion in responsibilities.

21. The Airport attempted to assure Ms. Easie-Samuels that she was being reassigned due to a "communications gap in the organization" and that she would now have the responsibility of a center of excellence.

22. From here, the targeted attack to push Ms. Easie-Samuels out of her position with the Airport began.

23. In April of 2022, Ms. Easie-Samuels was in a meeting with CEO Cassotis and the Vice Presidents of Marketing Communication.

24. The group was discussing a British Airways outline that Ms. Easie-Samuels commented "didn't make sense."

25. Having been born and raised in the United Kingdom, Ms. Easie-Samuels felt compelled to share her thoughts, which was common for other Vice Presidents to do during similar meetings.

26. Following the meeting, Ms. Easie-Samuels was called into CEO Cassotis' office and reprimanded.

27. She was told that it was "not part of the culture" to express feedback like that.

28. Meanwhile, Ms. Easie-Samuel's Caucasian comparators were invited to freely express their opinions during meetings, which often included stating things were "shit" and other swear words, without reprimand.

29. From this point forward, Ms. Easie-Samuels kept her head down and her opinions to herself, as instructed.

30. Despite being told to do so, Ms. Easie-Samuels was then criticized by CEO Cassotis' during a one-on-one meeting later that month for her silence.

31. CEO Cassotis claimed it seemed as though Ms. Easie-Samuels didn't want to be there.

32. Ms. Easie-Samuels advised CEO Cassotis that she has been told she "shows off about her experience" and is constantly "tone policed" if she says anything.

33. Ms. Easie-Samuels also told CEO Cassotis she is consistently judged by the white members of their team and scrutinized to a level that her white comparators are not, engaging in protected activity under Title VII.

34. In May, the Airport began stripping Ms. Easie-Samuels of her responsibilities.

35. Ms-Easie-Samuels was given a consultant to work with, Mark Dollins, who she was told would be extra support for her team.

36. Later that month, Ms. Easie-Samuels was directed to report to Mr. Dollins, who began acting as the intermediary between she and CEO Cassotis moving forward.

37. CEO Cassotis forced Ms. Easie-Samuels to send an email to all senior leaders, her Vice President Peers and directors apologizing to all leaders for a meeting that she held that allegedly ran late.

38. First, Ms. Easie-Samuels' meeting did not run past the time for which it was scheduled, and second, Ms. Easie-Samuels' white comparators regularly held meetings that went past their scheduled time.

39. Her white comparators were never forced to email embarrassing apologies to all leadership members.

40. Also in May, CEO Cassotis held a meeting with all of the Marketing Communications leaders to announce salary adjustments for the upcoming year.

41. When she got to Ms. Easie-Samuels, she announced, "Charmaine, there is nothing for you," in front of all of her peers in an effort to further embarrass her.

42. CEO Cassotis then corrected herself saying "oh my mistake, there does seem to be something for you," in an unpleasant tone.

43. Additionally, despite the reorganization and stripping of her duties, CEO Cassotis continued to blame Ms. Easie-Samuels for Mr. Dollins' work.

44. For example, on June 29, 2022, CEO Cassotis sent Ms. Easie-Samuels a hostile email chastising her for a July 4 message that Mark Dollins created and for which she was responsible.

45. The Airport's attitude towards People of Color was more clearly revealed in July of 2022 when Ms. Easie-Samuels went to Human Resources to verify that it would be okay for Persons of Color to utilize a meeting room during lunch time to connect and build relationships as part of retention and supporting the Airport's claimed Diversity and Inclusion initiative.

46. Senior Vice President of Human Resources, Rachel Moosa, said she did not see a problem with this, but that she would get back to Ms. Easie-Samuels.

47. Ms. Easie-Samuels said she just wanted to be certain because she had a feeling that if there was a room full of People of Color, this would get back to Human Resources or the CEO and that she did not want people to question the situation.

48. Ms. Moosa checked with Ms. Naylor, CHRO, who forbid the gathering.

49. Human Resources stated that the Airport forbids "Employee Resources Groups," that the "Organization is not ready for this," and that they needed to take such an initiative "off campus on their own time."

50. Ms. Moosa told Ms. Easie-Samuels that she was shocked by this response.

51. In August of 2022, Ashlee Wallace took over as the Senior Vice President of Marketing Communications and Ms. Easie-Samuels' new supervisor.

52. Ms. Wallace immediately began to treat Ms. Easie-Samuels different than her Caucasian counterparts,

53. The following is a non-exhaustive list of such disparate treatment:

   a. On September 1, 2022, in a meeting with Ms. Wallace and the other Vice Presidents, Ms. Wallace told Ms. Easie-Samuels she needed to handle getting her own freelancer and providing the scope of the work to that individual. All of the other Vice Presidents were permitted to use Nicki Campbell, their consultant, to perform this work.

   b. Throughout this time, Ms, Wallace was demanding immediate summaries, updates and statuses on work items. When Ms. Easie-Samuels would follow up with her after what she would provide, Ms. Wallace would tell her what she as working on was not a priority. She was also intentionally failing to pass along Ms. Easie-Samuels' projects to CEO Cassotis.

    c. On September 13, 2022, during a meeting with Ms. Wallace about a project, Ms. Wallace shifted the conversation to chastise Ms. Easie-Samuels for not yet responding to an email she sent the night before at 10:35 PM. She asked Ms. Easie-Samuels for an explanation, to which she responded that it was not her project, and she assumed the individual whose project it was (who was on the email) was responding, as she did not have the details to enable her to respond but was in the process of gathering them. Ms. Wallace told her to "stop interrupting [her]," even though she invited Ms. Easie-Samuels to respond, shocking and humiliating her. She then indicated that this would be taken offline. This interaction caused Ms. Easie-Samuels to file a complaint with Human Resources as she, the one Person of Color, was consistently being blamed and scapegoated for other Vice Presidents' failures which were outside of her control.

54. The Airport further engaged in microaggressions towards Ms. Easie-Samuels by criticizing her "tone" and vernacular, claiming that she was tough, harsh, rude and abrasive.

55. On September 15, 2022, Ms. Easie-Samuels met with Ms. Moosa to make her formal complaint of race discrimination.

56. Ms. Noosa asked Ms. Easie-Samuels if she wanted her to investigate, to which Ms. Easie-Samuels agreed, but noted that she anticipated she would be retaliated against.

57. Ms. Easie-Samuels attempted to work things out with Ms. Wallace, who continued to treat her with hostility.

58. She told her she needed to "fit in more" with their all-white team and criticized her for not sitting with them at an internal event.

59. Ms. Easie-Samuels responded that their team makes no effort with her and when they got on the bus to go to the event, no one even said hello or responded to her greetings, and that she notices that when she speaks during meetings, they all smirk and make faces, subjecting her to a hostile work environment.

60. Later, Ms. Moosa came to see Ms. Easie-Samuels to see if Ms. Wallace apologized and she informed her that she had not.

61. Immediately thereafter, Ms. Wallace began asking Ms. Easie-Samuels where her files and work was being stored for her projects, verifying that these items were in a shared folder to which she had access, demonstrating their intend to terminate her in retaliation for engaging in protected activity.

62. Ultimately, on September 26, 2022, Ms. Easie-Samuels was terminated via a telephone conference with Ms. Naylor and Ms. Moosa.

63. The reason provided for her termination was vague; she was simply told it was "due to relationships."

64. The individuals involved in the decision to fire Ms. Easie-Samuels were not the same individuals with whom she interviewed, or those who made the decision to hire her.

65. Ms. Easie-Samuels was a successful employee following her complaints of disparate treatment as a Person of Color, she was subjected to illegal retaliation and fired.

**COUNT II**
**Discrimination and Retaliation in Violation of the Title VII of the Civil Rights Act of 1964**

66. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein at length.

67. The foregoing conduct, including the specific targeting of Ms. Easie-Samuels, along with other adverse actions directed at her because of her race/national origin and for opposing discrimination, constitutes unlawful discrimination and retaliation against Plaintiff.

68. At all times relevant, each Defendant was an "employer" within the meaning of Section 701(b) of Title VII.

69. Ms. Easie-Samuels was subjected to a hostile work environment and was intentionally discriminated and retaliated against because of her race/national origin, in violation of Title VII.

70. Ms. Easie-Samuels was also treated differently and held to different standards than her Caucasian comparators.

71. The Airport attempted to paint Ms. Easie-Samuels as the "angry Black woman," when her Caucasian comparators acted similarly, without reprimand.

72. Defendants knew or should have known about the discriminatory conduct and harassment to which Ms. Easie-Samuels was subjected and failed to take appropriate remedial action.

73. Ms. Easie-Samuels made complaints to Human Resources and other leaders about the hostile work environment to which she and other people of color were subjected.

74. Defendant's failure to maintain a workplace free of harassment and a failure to take prompt remedial action to address the hostile work environment and discrimination to which Plaintiff was subjected was intentional, malicious and in reckless indifference to Ms. Easie-Samuels' protected federal and state rights.

75. As a result of Defendant's unlawful discrimination, Ms. Easie-Samuels has suffered damages as set forth herein.

76. Defendant's unlawful treatment of Ms. Easie-Samuels based on her race/national origin and in retaliation for opposing discrimination as well the Defendants' more favorable treatment of white employees constitutes conduct and employment practices made illegal under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a)(1), and the Pennsylvania Human Relations Act.

77. The Airport's conduct described above had the purpose and effect of depriving Ms. Easie-Samuels of the rights enjoyed by individuals outside her protected class and, therefore, was in violation of Title VII and the PHRA.

78. The Airport made the decision to fire Ms. Easie-Samuels because she opposed conduct made illegal under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a)(1), and therefore violated 42 U.S.C. §2000e-3(a).

79. As a direct and proximate result of the discrimination, disparate treatment, harassment, retaliation, hostile work environment and wrongful termination which Ms. Easie-Samuels suffered while employed by Defendant, she has suffered not only tangible economic loss in the form of lost back pay and benefits and potential lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, and pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she has suffered and will continue to suffer.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra.*

## COUNT III
**Discrimination and Retaliation in Violation of the Pennsylvania Human Relations Act**

80. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein at length

81. This is an action arising under the provisions of the laws of the PHRA and this Honorable Court has, and should, exercise pendent jurisdiction over the same because the cause of action set forth in this COUNT III arises out of the same facts, events and circumstances as in the above COUNTS I AND II, and therefore judicial economy and fairness dictate that this COUNT II be brought in this same Complaint.

82. At all times relevant, Defendant was an "employer" within the meaning of Section 954(b) of the PHRA.

83. By engaging in the creation and fostering of a discriminatory environment based on Ms. Easie-Samuels' race/national origin, Defendant violated those sections of the PHRA which prohibits discrimination based upon race/national origin regarding the continuation and tenure of employment.

84. Plaintiff further maintains that Caucasian employees acted similarly to Ms. Easie-Samuels and were not disciplined or discharged.

85. Defendant's termination of Plaintiff's employment was motivated by her race/national origin and/or was in retaliation for her complaints of discrimination.

86. Defendant's unlawful and discriminatory practices complained of herein were intentional and done with malice or without reckless indifference to Plaintiff's state-protected rights.

87. As a direct and proximate result of the unlawful and discriminatory practices described herein, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and potential lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, and pain and suffering, and is entitled to

compensatory damages for these injuries, in addition to the tangible economic losses she has suffered and will continue to suffer.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

## COUNT III
## 42 U.S.C. § 1981- INTENTIONAL RACIAL DISCRIMINATION

88. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein at length.

89. Section 1981 declares that all persons "shall have the same right ... to the full and equal benefit of all laws and proceedings ... as is enjoyed by white citizens," 42 U.S.C. § 1981 and "prohibits not only racial discrimination but also retaliation against those who oppose it.

90. Plaintiff was subjected to racial discrimination and retaliation because she is Black.

91. Plaintiff suffered the adverse employment actions identified supra.

92. The adverse employment actions suffered occurred under circumstances giving rise to an inference of discrimination.

93. A casual connection exists between Plaintiff's race, engagement in protected activities and Defendant's treatment of Plaintiff.

94. In unlawfully discriminating and retaliating against Plaintiff, Defendant acted willfully, wantonly, and/or with malice or conscious and/or reckless indifference to Plaintiff's equal rights under law, thereby necessitating the imposition of punitive damages.

95. As a result of Defendant's conduct, Plaintiff has suffered loss of income, emotional pain and suffering, embarrassment, and inconvenience and she is entitled to general and special damages, and economic damages, including, but not specifically limited to back pay. Plaintiff is also entitled to and seeks her attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

## DEMAND FOR JURY

WHEREFORE, Plaintiff demands judgment against Defendant, and damages in excess of $75,000 as follows:

a. That Plaintiff be awarded actual and consequential damages to make Plaintiff whole including back pay with prejudgment interest, front pay and compensation for lost benefits, in an amount to be proven at trial, and other affirmative relief necessary to eradicate the effects of Plaintiff's damages associated with Defendant's discrimination, retaliation and wrongful termination of Plaintiff pursuant to the Title VII, §1981 and the PHRA;

b. That Plaintiff be awarded economic and compensatory damages to compensate for all costs associated with the discrimination and retaliation including lost wages and medical expenses;

c. That Plaintiff be awarded nominal damages;

d. That Plaintiff be awarded punitive damages in an amount sufficient to punish Defendant for its intentional, wanton and malicious conduct and to deter similar misconduct;

e. That Plaintiff be awarded the costs of this litigation, including reasonable attorney's fees; and

f. That Plaintiff be awarded such further relief as deemed to be just and proper.

Date:   September 4, 2023                         Respectfully Submitted,

                                                  */s/ Stephanie L. Solomon*
                                                  Stephanie L. Solomon, Esquire

Pa. I.D. 208056
HKM EMPLOYMENT ATTORNEYS LLP
220 Grant Street
Suite 401
Pittsburgh, PA  15219
412.760.7802
ssolomon@hkm.com

**JURY TRIAL DEMANDED**